**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RADCLIFFE MANYAN et al.,

       *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA et al.,

       *Defendants*.

Civil Action No. 23-3192 (TJK)

**<u>MEMORANDUM OPINION</u>**

Maurica Manyan had just completed a mandatory training session as a special police officer when Jesse Porter, the trainer with whom the District of Columbia had contracted, shot her with his firearm. Tragically, Manyan died from her injuries later that day. Over a year later, Manyan's parents and son sued Porter, his training company, Byron Purnell (Porter's co-trainer), the District of Columbia, and Metropolitan Police Department officer Anthony Mickens. The Manyans amended their complaint twice, and the operative pleading brings ten claims against all defendants: four federal claims for violating the Fourth and Fifth Amendments, and six state-law claims sounding in tort. Two defendants—the District and Mickens—move to dismiss all claims against them.

The Court agrees with the District and Mickens that the Manyans have not stated a federal claim against either of them. Porter, not Mickens, shot Manyan, and the allegations do not provide a basis for finding that Mickens violated Manyan's constitutional rights as a supervisor or otherwise. Nor do the Manyans adequately allege that a city policy caused any constitutional violation, so the District cannot be liable as a municipality. Thus, the Court will grant the motions to dismiss those federal claims against the District and Mickens. Finally, because that dismissal leaves only common-law claims against these defendants, and because those claims seem to implicate novel

and complex state-law questions, the Court doubts the propriety of exercising supplemental juris-diction over the remaining claims against the District and Mickens.  The parties, however, did not meaningfully address this issue in their briefing.  So the Court will deny the motions to dismiss without prejudice as to the state-law claims and permit the District and Mickens to file renewed motions to dismiss, which should explain why the Court should retain jurisdiction over those claims despite the presence of seemingly unsettled state-law issues.

## I.    Background

According to the operative complaint, Manyan was a Special Police Officer who worked in the D.C. Public Library system.  ECF No. 52 ("Second Am. Compl.") ¶ 44.  In the summer of 2022, the District of Columbia contracted with Jesse Porter, Jr.'s company—Porter Consulting and Expert Tactical Training LLC—to conduct baton training for Manyan and other D.C. Public Library Special Police Officers.  *Id.* ¶¶ 29, 46.  Officer Anthony Mickens allegedly "coordinated the site visit for Porter," including "the date, time, and location of the mandatory training."  *Id.* ¶¶ 16, 39.  Mickens also provided Manyan and other trainees with safety gear, secured parking for Porter, and "buzzed him into the secure area of" the Anacostia library.  *Id.* ¶¶ 38, 40.

Porter allegedly walked into the library on August 4, 2022 "with an open and notorious[] loaded firearm in plain view."  Second Am. Compl. ¶¶ 40, 54.  Neither Mickens nor Byron Purnell, Porter's co-trainer and employee at the time, told Porter to remove the firearm "from his hip" or from the premises.  *Id.* ¶¶ 43, 49.  Once the training began, Porter treated Manyan differently than he did male trainees.  For example, he was allegedly "dismissive" when Manyan answered questions, became irritated when she read too slowly, and said that she "look[s] like she sleeps on her stomach."  *Id.* ¶¶ 61, 63, 71.  Porter also "point[ed] his finger" at Manyan and "pull[ed] the trigger of a make believe gun," and then did the same with an "orange simunition [sic] weapon."  *Id* ¶ 61.

After spending the morning reviewing a presentation, the officers practiced baton and handcuff techniques that they had learned earlier in the day. Second Am. Compl. ¶¶ 58, 75. They then removed their protective gear, including bulletproof vests, and started posing for pictures once the training concluded. *Id.* ¶¶ 76–77. When Manyan began "fixing her hair," Porter allegedly referred to her as "Rihanna." *Id.* ¶ 78.

Porter eventually stepped out of the photograph line, aimed his loaded firearm at Manyan, and shot her in the chest. Second Am. Compl. ¶ 79. She died that same day from her injuries. *Id.* ¶ 92. Manyan's family asked to view her body multiple times, but the District denied them access for several days. *Id.* ¶ 97. That same month, counsel for the Manyan family requested surveillance footage from the day of the training under the Freedom of Information Act. *Id.* ¶ 105. The District rebuffed that request for about a year before turning over the video. *Id.* ¶¶ 106–112. In August 2023—just over a year after the shooting—Porter pleaded guilty to involuntary manslaughter. *Id.* ¶ 102.

In October 2023, Manyan's son (through his father) and parents—collectively, "the Manyans"—sued the District of Columbia, Porter, his company, Mickens, and Purnell. *See* ECF No. 1. The second amended complaint brings ten claims against each defendant. Four sound in federal law: Fourth Amendment violation (Count I); Fifth Amendment violation (Count II); "Excessive force resulting from inadequate training, supervision, and discipline" (Count VII); and "Failure to train, custom and policy of indifference under *Monell*" (Count VIII). The other six are tort claims under state law: battery (Count III); intentional infliction of emotional distress (Count IV); "negligence/gross negligence" (Count V); negligent infliction of emotional distress (Count VI); gross negligence (Count IX); and "tortious interference with a dead body" (Count X). For each claim, Manyan's parents seek damages "individually and in their capacity as the co-personal

representatives of" Manyan's estate under the Survival Act, D.C. Code § 12-101, and the Wrongful

Death Act, *id.* § 16-2701. *See* Second Am. Compl. ¶¶ 128–29, 142–43, 149–50, 164–65, 179–80,

192–93, 203–04, 212–13, 226–27, 235–36. Manyan's son, through his father, requests damages

in his individual capacity under the Wrongful Death Act. *See id.*; *see also id.* ¶ 13.

The District and Mickens moved to dismiss all claims against them. ECF Nos. 40, 41.

Porter did not; he and his company answered instead. ECF Nos. 42, 43. Because Purnell did

neither, the Manyans requested—and the Clerk entered—an entry of default against him. ECF

Nos. 48, 53.

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A plaintiff states a facially plausible claim when he pleads "factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true "all well-pleaded

factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's

favor." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014). But "mere conclusory statements" are not

enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion

couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III.    Analysis

The District and Mickens each offer several reasons to dismiss the federal and state-law

claims. As for the former, the Court finds that some are dispositive and thus does not address

every argument. Specifically, the Manyans do not plausibly allege that Mickens violated Man-

yan's constitutional rights or that he is otherwise liable under § 1983. Nor do their allegations

provide a basis for holding the District liable as a municipality. And without those federal claims,

the Court hesitates to exercise supplemental jurisdiction over the common-law claims given the seemingly novel and complex state-law questions that they raise. So the Court will allow the District and Mickens to renew their motions to dismiss those claims, and to first address why the Court should exercise supplemental jurisdiction to do so.

### A.    The Manyans Fail to State a Federal Claim Against the District or Mickens

Section 1983 provides a cause of action when a "person," "act[ing] under color of state law," deprives an individual "of a federal right." *Rodriguez v. District of Columbia*, 118 F. Supp. 3d 132, 137 (D.D.C. 2015) (citation omitted). At minimum, a plaintiff must allege "a predicate" violation of the Constitution or a federal statutory right. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). And a plaintiff suing a municipality must also establish that a "custom or policy of the municipality caused the violation." *Id.* In other words, because a municipality like the District "is not liable under § 1983 for injuries 'inflicted solely by its employees or agents,'" a plaintiff must allege that "the government itself, as an institution, was the 'moving force behind the violation' of her federal rights." *Givens v. Bowser*, 111 F.4th 117, 122 (D.C. Cir. 2024) (first quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), and then *Frederick Douglass Found., Inc. v. District of Columbia*¸ 82 F.4th 1122, 1136 (D.C. Cir. 2023)). And clearing that bar requires a plaintiff to plead "facts that plausibly support one of th[e] four types of municipal policies": "(1) an official policy explicitly adopted by [the municipality], (2) actions by a [municipal] policymaker with final decision-making authority, (3) repeated behavior by . . . municipal employees that have reached the level of a custom, or (4) a failure to act by [the municipality] that shows deliberate indifference to the potential for such violations." *Id.*

The Manyans stylize two of their claims as constitutional violations—Counts I and II— and two, seemingly, as "§ 1983" violations—Counts VII and VIII. But § 1983 "is not itself a source of substantive rights"; it "merely provides a method for vindicating federal rights elsewhere

conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted). That is why the "first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.*

Here, the Manyans ultimately allege violations of two constitutional rights: those protected by the Fourth and Fifth Amendments. The former protects against unreasonable searches and seizures, including the "right to be free from the use of excessive force." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 18 (D.D.C. 2011) (citation omitted). And the latter guarantees due process of law, meaning that a "governmental official" violates the amendment if his behavior "is so egregious" and "so outrageous[] that it may fairly be said to shock the contemporary conscience." *Feirson v. District of Columbia¸* 506 F.3d 1063, 1066 (D.C. Cir. 2007) (citation omitted). That high bar is "[m]ost likely" to be cleared when the "conduct" is "intended to injure in some way unjustifiable by any government interest," though "reckless[] or gross[ly] negligen[t]" behavior creates a "closer call[]." *Id.* at 1066–67 (citation omitted). For the federal claims to survive these motions to dismiss, then, the Manyans must have plausibly alleged that either the District or Mickens is liable under § 1983 for violating either of those constitutional rights.

### 1. Mickens

Read charitably, the second amended complaint appears to allege that Mickens is liable under § 1983 for several reasons. First, the Manyans say that he personally violated the Fourth and Fifth Amendments. *See* Second Am. Compl. ¶¶ 114–43. Second, they suggest that he is liable as Porter's "supervisor" for Porter's alleged violation of those amendments. *See id.* ¶¶ 195–204. And third, the Manyans include Mickens in Count VIII, which alleges "*Monell*" liability for failure to train. *See id.* ¶¶ 205–13. None of these theories saves the federal claims against Mickens from dismissal.

To hold Mickens liable under § 1983 as an "individual actor[]," the Manyans must allege

that he, "through" his "own individual actions, has violated the Constitution." *Rodriguez*, 118 F.
Supp. 3d at 141 (citation omitted). But their allegations focus on *Porter*'s conduct. By "intentionally depressing the trigger of his live and loaded firearm[]," Porter "terminat[ed]" Manyan's
"freedom of movement" and "violat[ed]" her Fourth Amendment rights. Second Am. Compl.
¶ 121. Further, it was Porter's decision to, "without justification," "sho[o]t" Manyan and
"depriv[e] her of life without due process of law." *Id.* ¶ 134. These allegations say nothing about
whether *Mickens* unreasonably seized Manyan or behaved in a conscience-shocking way that violated her due-process rights. So to the extent the Manyans pin the constitutional violations on the
shooting, that is no basis for a § 1983 claim against Mickens.

    The allegations focused on Mickens's behavior do not fill the gap. True, Mickens allegedly
coordinated the training session, and he neither removed Porter's firearm nor gave "any trainee an
opportunity to object to the dangerous situation he created with Purnell and Porter." Second Am.
Compl. ¶ 117. But none of that conduct suggests that Mickens unreasonably seized Manyan—or
that he seized her at all. Coordinating a training and failing to remove another individual's firearm
is not "restrain[ing] the liberty" of Manyan "by means of physical force or show of authority."
*United States v. Mendenhall*, 446 U.S. 544, 552 (1980) (citation omitted). And even if Mickens
made the training mandatory for Manyan and other officers without providing a chance to object
to Porter's presence or firearm, that does not "describe[] a 'seizure.'" *Feirson*, 506 F.3d at 1067.
The question "is whether a reasonable person would have believed he would be detained if he
disobeyed" Mickens and left the training—"not whether he feared negative consequences for his
job." *Id.* And no allegations suggest that Manyan reasonably believed that someone would restrain
her liberty if she objected to the training.

    For similar reasons, the Manyans do not plausibly allege that Mickens personally violated

the Fifth Amendment.  Count II focuses on Porter's shooting of Manyan; it does not even mention Mickens by name.  *See* Second Am. Compl. ¶¶ 130–43.  The parts of the complaint that do describe Mickens's behavior, moreover, fall far short of the "stringent standard" requiring allegations of conduct so egregious that it "shocks the conscience."  *Molina-Aviles v. District of Columbia*, 824 F. Supp. 2d 4, 9–10 (D.D.C. 2011) (citation omitted).  Simply put, coordinating a training session and not removing the weapon of a trainer hired by the District do not clear that hurdle, no matter how shocking *Porter*'s actions ultimately were.

To the extent the Manyans resort to a theory of supervisor liability, the allegations do not support that claim either.  It is not enough to allege that a supervisor "merely fails to detect and prevent a subordinate's misconduct."  *Smith v. District of Columbia*, 149 F. Supp. 3d 128, 134 (D.D.C. 2015) (quoting *Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004)).  Instead, such liability attaches only if the supervisor "know[s] about the" subordinate's "conduct" and "facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye for fear of what they might see."  *James v. District of Columbia*, No. 20-cv-335 (EGS), 2022 WL 951265, at *3 (D.D.C. Mar. 30, 2022) (citation omitted).  Said differently, "absent an allegation that" Mickens "had actual or constructive knowledge of past transgressions or that" he was "responsible for or aware of 'clearly deficient' training," he "did not violate any constitutional right through inaction or failure to supervise."  *Id.* (citation omitted).

The second amended complaint falters against this standard.  To begin, the allegations focus mainly on the *District*'s "grossly inadequate training, supervision and discipline of its officers"—including Mickens—"regarding live and loaded firearm(s)."  Second Am. Compl. ¶¶ 14, 200.  And *that* faulty supervision, the Manyans say, caused the deprivation of Manyan's "rights under the Fourth and Fifth Amendments."  *Id.*  True, the Manyans also allege that "Mickens

directly supervised Porter." *Id.* ¶ 41. But their supervisor-liability theory remains defective because they do not allege facts suggesting that Mickens should have known about any past misconduct by Porter such that his inaction violated Manyan's constitutional rights. As far as the allegations go, Mickens had no experience with Porter—and certainly none implying that Porter would shoot an officer at the end of a training session. That Mickens saw Porter's firearm makes no difference. Even if Porter violated D.C. law by bringing his firearm into the public library, *see* D.C. Code § 7–2509.07(a)(1), that infraction does not implicate a constitutional right for § 1983 purposes. Section 1983, after all, "guards and vindicates federal rights alone," and "[v]iolations of state law do not state a claim under" the statute. *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000); *see also, e.g.*, *Williams v. Shah*, 927 F.3d 476, 479 n.1 (7th Cir. 2019). So although Porter's decision to bring a loaded firearm to a baton training session might have suggested that Porter lacked good judgment, that single experience with him does not show that Mickens failed to supervise in a way that violated Manyan's constitutional rights. The Manyans, in short, fail to allege facts suggesting that Mickens knew or should have known that Porter would violate constitutional rights, so whatever additional supervision they would have preferred (or that might have been advisable) is no basis for holding Mickens liable as a supervisor.

Lumping Mickens into Count VIII's "*Monell*" claim does not help the Manyans either. Such a "claim" is not a freestanding violation; it is merely how a plaintiff can establish "that a municipality" is "liable under § 1983" for "caus[ing] the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). But because Mickens is (obviously) not a municipality, including him in the *Monell* count does not support a claim that he is responsible for any violation of Manyan's federal rights.

The Manyans offer little in defense of their constitutional claims against Mickens. Starting

with the Fourth Amendment, they contend that Mickens was a state actor.  *See* ECF No. 45 at 8–
9.  But that argument conflates a necessary showing with a sufficient one.  Establishing that an
officer's conduct amounts to state action does not alone establish the deprivation of a constitutional
right.  *See Flagg Bros., Inc. v. Brooks¸* 436 U.S. 149, 156–57 (1978).  Instead, the Manyans needed
to—but did not—plausibly allege state action *and* a violation of Manyan's constitutional rights by
Mickens.  And on this front, they fall back on the previously described behavior—Mickens's co-
ordination of the training logistics and Porter's access to the building—which does not amount to
a Fourth Amendment seizure.  *See* ECF No. 45 at 9–10.  To repeat, even if Mickens made the
training more dangerous by not removing Porter's firearm, that does not mean that he used "phys-
ical force" to "restrain" Manyan's "movement" or that she "submit[ted] to" Mickens's "show of
authority."  *United States v. Veney*, 45 F.4th 403, 405 (D.C. Cir. 2022).

The Manyans' Fifth Amendment claim suffers from similar shortcomings.  In their view,
"[t]he deadly force" used against Manyan "rises to the level of a conscience-shocking violation of
[her] substantive due process rights."  ECF No. 45 at 12–13.  But *whose* use of deadly force?  As
explained, Mickens is not liable for Porter's actions.  And the Manyans' "effort[s] to hold" Mick-
ens "personally liable" for Porter's seemingly unprompted shooting "fade[] into *respondeat supe-
rior* or vicarious liability, clearly barred under Section 1983."  *James*, 2022 WL 951265, at *4
(quoting *Int'l Action Ctr.*, 365 F.3d at 27).

As for the remaining two federal counts, the Manyans again focus on the state-action re-
quirement when defending Count VII ("excessive force" under § 1983).  That argument, though,
does not address the flaw in any supervisor theory of liability that the Manyans might be pressing:
the second amended complaint does not plausibly allege that Mickens knew about Porter's mis-
conduct and in some way "facilitate[d]" or "condone[d] it."  *James*, 2022 WL 951265, at *3

(citation omitted).  At most, Mickens knew that Porter was unlawfully carrying a pistol.  But that potential violation of D.C. law is not a constitutional-rights issue, nor does it suggest that Porter would shoot a trainee such that Mickens had a duty to "safeguard against" that "constitutional transgression[]."  *Id.*  Finally, the Manyans do not explain why Count VIII—which alleges municipal liability under *Monell*—should survive against Mickens, who is (obviously) not a municipality.  *See* ECF No. 45 at 17–21.

For all these reasons, the Manyans do not plausibly allege that Mickens deprived Manyan of a federal right.  So the Court will grant Mickens's motion to dismiss as to Counts I, II, VII, and VIII.

### 2.    The District

The Manyans offer two theories of municipal liability on the District's part for the alleged constitutional violations.  Throughout their complaint, they allege that the District had a "custom" or "practice" of "permitting live and loaded firearm(s) and ammunition in training sessions."  Second Am. Compl. ¶ 211; *see also id.* ¶ 136.  Further, they add that the District failed to train its officers and was thus deliberately indifferent to Manyan's constitutional rights.  *See id.* ¶¶ 205–13.  The allegations underlying these theories, however, do not support the inference that "action pursuant to official municipal policy caused" the alleged constitutional "injury."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citations omitted).  So the District is not "actually responsible" and cannot be liable under § 1983.  *Id.* at 61 (citation omitted).

A custom-or-practice theory may rely on a municipality's decision to "set" a non-explicit policy by adopting, "through a knowing failure to act," the "actions" of its employees "that are so consistent that they have become 'custom.'"  *Baker*, 326 F.3d at 1306.  To make that showing, a plaintiff "must allege concentrated, fully packed, precisely delineated scenarios as proof that an unconstitutional policy or custom exists."  *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C.

2013) (Jackson, J.) (internal quotation marks and citation omitted). And for a municipality to be "liable based on a pattern of similar constitutional violations, a plaintiff must" allege facts suggesting that the municipality "knowingly ignore[d] a practice that was consistent enough to constitute custom." *Hurd v. District of Columbia*, 997 F.3d 332, 338 (D.C. Cir. 2021) (citation omitted). This "consistent past practice," moreover, "must consist of 'facially similar past wrongdoing' to the predicate violation." *Johnson v. District of Columbia*, No. 22-cv-3167 (JEB), 2023 WL 2770392, at *5 (D.D.C. Apr. 4, 2023).

The Manyans do not plausibly allege that the District's employees "engaged in a persistent or regular pattern of conduct that gave rise to the alleged constitutional violations." *Leach v. District of Columbia*, No. 19-cv-947 (APM), 2022 WL 1316436, at *13 (D.D.C. May 3, 2022) (citation omitted). Beyond their "conclusory allegations" about a custom—which are "insufficient to state a claim for relief under § 1983"—the Manyans allege only a few facts supporting their theory. *Page*, 999 F. Supp. 2d at 282. Specifically, they say that three individuals "complained of the widespread and common practice" of "permitting live and loaded firearm(s)" in trainings before Porter shot Manyan. Second Am. Compl. ¶ 24. But those allegations suffer from several problems. For one thing, pointing to three complaints over an unspecified period—the Manyans provide a date (August 2020) for only one of the complaints—"render[s] it impossible to determine whether the practice is so persistent and widespread as to practically have the force of law." *Hardrick v. District of Columbia*, No. 23-cv-2151 (TJK), 2024 WL 4286053, at *7 (D.D.C. Sept. 25, 2024) (citation omitted). Without more detail, these complaints could have addressed "incidents" that "occurred over the course of a week or a decade." *Id.*

For another, the complaints about carrying live weapons do not suggest that the District had a custom that caused constitutional injuries. Those complaints say nothing about whether

"anyone else . . . suffered" a "harm" that is "similar" to Manyan's.  *Ware v. District of Columbia*, No. 21-cv-2895 (TNM), 2022 WL 16571381, at *4 (D.D.C. Nov. 1, 2022).  So the "predicate violation"—the shooting of Manyan—is not "facially similar" to the alleged "past wrongdoing." *Johnson*, 2023 WL 2770392, at *5 (citation omitted).  Further, because the alleged "practice" that the three complaints supposedly illustrate—*i.e.*, permitting trainers to carry live firearms in training sessions—"is not 'itself' violative of any federal right," the Manyans must "show that the [municipality] engaged in that practice with deliberate indifference to the fact that it would lead officers to violate federal law." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598–99 (7th Cir. 2019) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*¸ 520 U.S. 397, 406–07 (1997)).  But the "complaints" about this practice never mention any constitutional harms that resulted from that practice, so those allegations are no basis for finding that the District was deliberately indifferent to any "constitutional hazard" that this alleged custom—even assuming it existed—created.  *Id.* at 599.  The Manyans' citation to a 2013 accident involving a trainee for the University of Maryland police says little (if anything) about whether the *District* had a particular custom or was deliberately indifferent to the constitutional risks of that custom.  *See* Second Am. Compl. ¶ 24 (citing NBC Washington, *Police Trainee Shot in Maryland Files Lawsuit*, https://perma.cc/8RB5-VP2T (June 15, 2013)).

For all these reasons, the Manyans do not allege "concentrated, fully packed, precisely delineated scenarios" supporting the existence of "an unconstitutional policy or custom" that caused the alleged deprivation of rights.  *Page*, 999 F. Supp. 2d at 285 (internal quotation marks and citation omitted).

The Manyans fare no better with their deliberate-indifference theory, which alleges mainly that the District failed to train its employees on how to address the presence of live firearms in

training sessions.  *See* Second Am. Compl. ¶ 211 (listing alleged training deficiencies related to this issue).  A "government's decision not to train certain employees"—or to train them inadequately—"about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for § 1983 purposes."  *Connick*, 563 U.S. at 61.  But only "[i]n limited circumstances."  *Id.*  Indeed, a local government's "culpability" for constitutional violations "is at its most tenuous where a claim turns on a failure to train."  *Id.*  "To constitute a 'policy or custom,'" such a failure "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact."  *Cherry v. District of Columbia*, 330 F. Supp. 3d 216, 225 (D.D.C. 2018) (internal quotation marks and citation omitted).  That is a "stringent standard of fault" requiring that "city policymakers" (1) have "actual or constructive notice that a particular omission in their training program causes" violations of constitutional rights and (2) "disregard[]" that "known or obvious consequence" through inaction.  *Id.* (citation omitted).  Typically, a "pattern of similar constitutional violations by untrained employees" is "necessary to demonstrate deliberate indifference."  *Id.* (internal quotation marks and citation omitted).  But the Supreme Court has left open the "possibility" of another path: the "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable . . . without proof of a pre-existing pattern of violations."  *Connick*, 563 U.S. at 64.

The Manyans do not plausibly allege deliberate indifference under either option.  As explained, the allegations do not show "a pattern of violations that should have put District officials on notice that its training program"—or lack thereof—"would cause a violation of constitutional rights."  *Bell v. District of Columbia*, 82 F. Supp. 3d 151, 157 (D.D.C. 2015).  The "legal conclusion[s] couched as . . . factual allegation[s]" do not move the ball forward.  *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 35 (D.D.C. 2015) (citation omitted); *see also, e.g.*, Second Am.

Compl. ¶ 202 (alleging that the District was "deliberate[ly] indifferen[t] to the risk" of constitutional violations). And the allegations of three complaints about the presence of firearms in training sessions do not reflect "a pattern of *unconstitutional* conduct" suggesting that "the District knew or should have known" about a risk of Fourth or Fifth Amendment violations. *Cherry*, 330 F. Supp. 3d at 226. Again, possessing a live firearm in a training—even if violative of D.C. law— is not itself a constitutional violation. Those complaints, in other words, do not describe "violations" having "materially similar legal implications" as the alleged violation here. *Johnson*, 2023 WL 2770392, at *6 (citation omitted). And as mentioned, the training accident at the University of Maryland, which happened over nine years before Porter shot Manyan, does not support the inference that the District should have known that *its* training program created a constitutional hazard. The Manyans, in sum, have alleged "no facts . . . indicating that the District was on notice that its officers' training . . . was deficient in ways that would lead to violations of the" Fourth or Fifth "Amendment[s]." *Kenley*, 83 F. Supp. 3d at 36.

Although the Manyans do not explicitly press the second failure-to-train option, their allegations do not fit that narrow potential path for deliberate-indifference claims lacking a "pre-existing pattern of violations." *Connick*, 563 U.S. at 64. In that context, a plaintiff must allege facts suggesting that the "unconstitutional consequences of failing to train were patently obvious." *Johnson*, 2023 WL 2770392, at *6 (internal quotation marks and citation omitted). In *Connick*, the Supreme Court described a "hypothetical example" of "single-incident liability" that *might* pass muster: suppose that a city "arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training" them about "the constitutional limitation on the use of deadly force." 563 U.S. at 63. That "decision not to train" might show deliberate indifference because of the "highly predictable consequence" that "violations of constitutional

rights" would result. *Id.* at 64 (citation omitted). But there must be an "obvious need for specific legal training," which was true in the *Connick* hypothetical because "[a]rmed police must sometimes make split-second decisions with life-or-death consequences" and because "police academy applicants are" presumably unfamiliar with constitutional limits on deadly force. *Id.* The bottom line is that "[q]ualifying circumstances under" a single-incident theory of deliberate indifference "are rare": "a constitutional violation must be a 'blatantly obvious' consequence of inaction." *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (cleaned up and citation omitted).

On these allegations, a constitutional violation was not a patently obvious result of the failure to train officers about how to handle the presence of live firearms in training sessions. Recall the crux of the training deficiency that the Manyans allege: "sworn members of the [Metropolitan Police Department]" should have received training (or more training than they did) about preventing the presence of live firearms in training spaces, whether by confiscating them, securing them elsewhere, or arresting the person possessing them. *See* Second Am. Compl. ¶ 211.[1] Perhaps the allegations suggest that not providing training (or better training) on this issue could lead to trainers accidentally discharging weapons. But although concerning, a trainer accidentally firing

---

[1] The Manyans also allege that MPD officers needed training on the "prohibition against" and "inherent dangers of" aiming guns at people. Second Am. Compl. ¶ 211. But *Porter* is the one who pointed his weapon at Manyan. And the Manyans allege that he was a "*former* Metropolitan Police Officer," not a current member of the force whom the District might have a responsibility to train. *Id.* ¶ 21 (emphasis added). That issue aside, the Manyans do not allege that the District had any reason to think officers—current or former—had been pointing guns at trainees. Instead, the alleged custom was "permitting armed trainers in a training building," not allowing them to aim guns at people. *E.g.*, *id.* ¶ 136. So this alleged training deficiency is still not like the hypothetical posed in *Connick*, where the nature of the task given to police officers—chasing felons while carrying firearms—suggested that violations of constitutional rights were a "highly predictable consequence" even without a "pre-existing pattern of violations." 563 U.S. at 64. In that situation, the city (might) not need to know about any violations to know that the practice jeopardized federal rights. But the District did not tell Porter to conduct training by pointing guns at trainees, nor did it have any reason to suspect that he would do that. So the single-incident liability theory does not work for this alleged failure to train either.

his weapon—without other "intentional action on the part of the officer" to effectuate a seizure—would not be a constitutional violation. *Corbitt v. Vickers*, 929 F.3d 1304, 1317 (11th Cir. 2019). In any event, it is "not sufficient" to allege that the training shortcomings "could conceivably or potentially lead to a constitutional violation." *Orozco v. Dart*, 64 F.4th 806, 826 (7th Cir. 2023). Rather, the failure to train must present such an "obvious risk of constitutional violations" that the District should have "been on notice of impending harm even with no pattern of past violations." *Id.* And the alleged constitutional violations here "do[] not naturally and imminently follow from the" purported training deficiencies, *id.*, because a trainer aiming and firing his weapon at a trainee is not a "patently obvious" risk of inadequate training on confiscating or otherwise removing live firearms. This case, then, is not one where the failure to train "creates enough risk of unconstitutional conduct to impose municipal liability for deliberate indifference" with no pattern of pre-existing constitutional violations. *Montgomery v. District of Columbia*, No. 18-cv-1928 (JDB), 2019 WL 3557369, at *7 n.8 (D.D.C. Aug. 5, 2019).

*Connick* drives this point home. In the hypothetical training deficiency discussed there, the city failed to train "novice" police officers on deadly force despite arming and "*deploy[ing]*" them "*to capture* fleeing felons." 563 U.S. at 63 (emphases added). That kind of failure to train might support single-incident liability because the municipality might know, given the nature of the task required of the officers, that the officers would encounter situations implicating a constitutional risk—namely, the "split-second decisions with life-or-death consequences" that armed officers must make when chasing criminals. *Id.* at 64. That is not this case. Here, the nature of training exercises—especially non-firearm trainings like this one, *see* Second Am. Compl. ¶ 22—does not put the District on notice of a risk of Fourth or Fifth Amendment violations absent training about the presence of live firearms. Unlike the armed pursuit of felons, trainings do not call for

District employees to subdue unpredictable criminals in volatile situations.  Training sessions, in other words, are not the kind of inherently constitutionally hazardous situation that *Connick* suggested might support single-incident liability under a deliberate-indifference theory.

Because the Manyans' allegations do not support an inference that the District is responsible as a municipality for the alleged constitutional violations, the Court will grant the District's motion as to Counts I, II, VII, and VIII.

### B.    The Court Will Deny Without Prejudice the District's and Mickens's Motions to the Extent They Request Dismissal of the State-Law Claims Against Them

The dismissal of the Manyans' federal claims against the District and Mickens raises jurisdictional questions about the remaining state-law tort claims against those defendants.  *See* Second Am. Compl. ¶¶ 144–150 (battery); ¶¶ 151–65 (intentional infliction of emotional distress); ¶¶ 166–80 ("negligence/gross negligence"); ¶¶ 181–94 (negligent infliction of emotional distress); ¶¶ 214–28 (gross negligence); ¶¶ 229–36 (tortious interference with a dead body).  The Manyans assert federal-question jurisdiction under 28 U.S.C. § 1331 but not diversity jurisdiction under 28 U.S.C. § 1332.[2]  So they need another jurisdictional hook for their non-federal claims.  Under 28 U.S.C. § 1367(a), the Court has "supplemental jurisdiction over . . . claims that are so related" to the federal claims "that they form part of the same case or controversy."  But even when that is true, the Court "may decline to exercise supplemental jurisdiction over a claim . . . if (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over" the

---

[2] According to the complaint's title page, Maurica Manyan's parents live in Maryland, while Manyan's son—or the son's father; the complaint is not clear on this point—lives in D.C. *See* ECF No. 52 at 1.  That destroys diversity jurisdiction, which "require[s] complete diversity between all plaintiffs and all defendants," because of the D.C. defendants.  *See Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005).  Further, "[p]leading a party's *residence* alone is insufficient to establish the *citizenship* necessary for diversity jurisdiction," so listing residences on the complaint would not establish diversity of citizenship even without that defect.  *Momenian v. Davidson*, 878 F.3d 381, 389 (D.C. Cir. 2017) (internal quotation marks and citation omitted).

federal claims, (3) the Court "has dismissed all" the federal claims, or (4) "in exceptional circumstances, there are compelling reasons for declining jurisdiction." § 1367(c). In those enumerated contexts, "state-law claims, though covered by § 1367(a)'s jurisdictional grant, are often better given to state courts." *Royal Canin U.S.A., Inc. v. Wullschleger*, No. 23–677, 2025 WL 96212, at *6 (Jan. 15, 2025).

The Manyans' state-law claims are part of the same controversy because they are closely related to the shooting, which forms the basis for the federal claims under § 1983. So the Court has "the power to decide the common law" tort claims. *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995). But whether to do so "is a matter left to the" Court's "sound discretion." *Id.* at 1265–66. Indeed, "[s]upplemental jurisdiction is a doctrine of discretion" rather than "a plaintiff's right," which holds true even when—as here—defendants urge the Court to exercise that jurisdiction. *Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 131 (D.D.C. 2011) (citation omitted). And this discretion is not limitless. For example, the D.C. Circuit has "repeatedly held that a district court abuses its discretion when it maintains jurisdiction over a removed case presenting unsettled issues of state law after the federal claims have been dismissed." *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014). "Nothing in § 1367's text," moreover, "distinguishes between cases removed to federal court and cases originally filed there." *Royal Canin U.S.A., Inc.*, 2025 WL 96212, at *6. The same concerns about exercising jurisdiction over state-law claims in certain contexts applies to both kinds of cases.

The District and Mickens ask the Court to retain supplemental jurisdiction over the state-law claims against them, and to dismiss them. *See* ECF No. 40 at 23; ECF No. 41 at 21–22. But they spend little time on the first step. And for several reasons, the Court doubts that it should exercise supplemental jurisdiction over the remaining claims against them. First, the Court "has

dismissed all claims" against the District and Mickens "over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). True, the federal claims remain live as to Porter, his company, and Purnell because they did not move to dismiss the second amended complaint. But the dismissal of every federal claim against the District and Mickens still "point[s] toward declining to exercise jurisdiction." *Mitchell v. Yates*, 402 F. Supp. 2d 222, 235 (D.D.C. 2005) (citation omitted). Without those claims, the Manyans' suit as to those defendants consists exclusively of state-law claims. And retaining jurisdiction would, at least arguably, require the Court to address "novel or complex issue[s] of State law" even though the case has no federal character when it comes to the District and Mickens. § 1367(c)(1). For those defendants, "federal law is not where the real action is." *Royal Canin U.S.A., Inc.*, 2025 WL 96212, at *5.

That is no small matter. The existence of a novel or complex state-law issue is an "independently sufficient" basis for declining supplemental jurisdiction. *Edmondson & Gallagher*, 48 F.3d at 1266. As the Supreme Court recently explained, district courts confronted with this situation "ordinarily should[] kick the case to state court." *Royal Canin U.S.A., Inc*, 2025 WL 96212, at *5. For good reason: "[N]eedless federal decisions of state law should be avoided both as a matter of comity and to promote justice between the parties." *Webster v. District of Columbia*, No. 20-cv-300 (JDB), 2020 WL 5107547, at *2 (D.D.C. Aug. 31, 2020) (cleaned up) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). After all, "the preference" is that "state courts apply state law," particularly when (as here) "public policy considerations" may be relevant to how a state court resolves the issues. *Brown v. Gino Morena Enters.*, 44 F. Supp. 2d 41, 53 (D.D.C. 1999). And the "more novel a local-law issue is, the more likely the federal court is to get it wrong"—not as a matter of first principles, but "in the sense of deciding the issue differently from how a local court would have decided it." *Fotobom Media, Inc. v. Google LLC*,

719 F. Supp. 3d 33, 55 (D.D.C. 2024) (citation omitted).  So "a federal court should be reluctant to retain . . . jurisdiction over" claims raising "question[s] for which state jurisprudence gives inadequate guidance."  *Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 93 F.3d 910, 922 (D.C. Cir. 1996) (citation omitted).

The state-law claims against the District and Mickens seem to present several complicated and unsettled questions.  Take the District's argument that the Comprehensive Merit Personnel Act ("the CMPA" or "the Act"), D.C. Code §§ 1–623.01 *et seq.*¸ bars the Manyans' state-law tort claims.  The Act "creates a workers' compensation scheme that is generally the exclusive remedy against the District for District employees injured in the course and scope of their employment." *Colbert v. District of Columbia*, 304 A.3d 199, 201 (D.C. 2023).  Specifically, the CMPA provides that the District's "liability" for "the injury or death of an employee" under the Act is "exclusive and instead of all other liability of the District"—whether to "the employee, his or her legal representative, . . . or any other person otherwise entitled to recover damages from the District . . . because of the injury or death."  D.C. Code § 1–623.16(c).  And if there is a "substantial question" about "whether an employee's injury is covered by the CMPA, the employee must submit her claim to the [Department of Employment Services]" first and may sue "only if the claim is disallowed" there.  *Colbert*, 304 A.3d at 209 n.8 (citation omitted).

The Manyans respond that the CMPA poses no problem for their state-law claims because the D.C. Court of Appeals has "held that mental and emotional injuries resulting from sexual harassment in the workplace could not be classified as 'injuries' arising out of employment."  *McCrea v. D.C. Police & Firefighters' Retirement & Relief Bd.*, 199 A.3d 208, 210 (D.C. 2019).  In other words, "when emotional distress allegedly attributable to sexual harassment (in contrast with some other cause) results in disabling injuries in fact," the injury does not "aris[e] out of" employment

and thus is not a compensable injury. *Estate of Underwood v. Nat'l Credit Union Admin.*, 665 A.2d 621, 633–34 (D.C. 1995) (interpreting materially identical language of Workers' Compensation Act). In the Manyans' view, Porter subjected Manyan to gender discrimination and sexual harassment before shooting her, so the harassment is intertwined with the shooting and triggers the exception to the Act's coverage.

That looks like a complex and uncertain question under D.C. law. *Underwood* addressed "injuries attributable *entirely* to sexual harassment," *Parkhurst v. D.C. Dep't of Emp't Servs.*, 710 A.2d 854, 856 (D.C. 1998) (emphasis added), and "urged caution regarding the scope of sexual harassment claims excluded from workers' compensation," *Nunnally v. D.C. Police & Firefighters' Retirement & Relief Bd.*, 184 A.3d 855, 861 n.11 (D.C. 2018). Since then, the D.C. Court of Appeals appears to have "left open the issue of" whether the CMPA covers situations "where the sexual harassment is but a part—albeit a significant part—of the claim of employment-originated injury." *Parkhurst*, 710 A.2d at 856 (cleaned up) (internal quotation marks and citation omitted). And the parties have not pointed the Court to any decisions settling that question, which seems critical to deciding whether the Manyans' allegations of sexualized comments and gender-based differential treatment are enough to squeeze their state-law claims into the *Underwood* exception. Against that backdrop, the "preference for having state courts apply state law" appears to apply in full force. *Gino Morena Enters.*, 44 F. Supp. 2d at 53.

Or consider an unanswered state-law question implicated by the remaining claims against Mickens. Like the District, he argues that the CMPA bars the Manyans' common-law claims. The Act's exclusive-liability provision, Mickens urges, protects from suit not only the District but also co-employees. But he acknowledges, as he must, that the "District of Columbia Court of Appeals has left open" that very question. *See* ECF No. 41 at 24. Indeed, in the recent *Colbert* case, that

court could have answered "whether a negligence suit directly against . . . a co-employee[]
would . . . be permissible under the CMPA." 304 A.3d at 202.  It did not, choosing instead to leave
this "open question" for another day.  *Id.* at 206.  This Court is wary of exercising supplemental
jurisdiction that would require it to get ahead of D.C. courts on that "complex" and unsettled legal
question.  *Webster*, 2020 WL 5107547, at *2.

Recall too that the District and Mickens move to dismiss the Manyans' claim for tortious
interference with a dead body.  Although Mickens's arguments seem straightforward, the District's
appear to raise potentially novel and complex questions.  Specifically, the District admits that the
"District of Columbia Court of Appeals has still not identified what 'right of action' a party has"
for alleged interference with access to a dead body under *Steagall v. Doctors Hospital*, 171 F.2d
352 (D.C. Cir. 1948).  ECF No. 40 at 36–37.  No matter, says the District, because the Manyans
fail to state a claim: the District does not "*currently* ha[v]e custody of Ms. Manyan's body," so
"there is no relief this Court can grant."  *Id.* at 37.

But D.C. law is not so clear on this point.  In *Washington v. John T. Rhines Co.*, the Court
of Appeals explained that "the *Steagall* right of action relates only to the surviving spouse's right
of possession and burial" of the body.  646 A.2d 345, 351 (D.C. 1994).  And when rejecting the
plaintiff's effort "to recover damages for emotional distress" for the "alleged mishandling of a
dead body," *Washington* relied in part on the "strict" zone-of-danger test for claims seeking "dam-
ages for negligently inflicted emotional distress."  *Id.* at 346–48.  More recently, though, the Court
of Appeals has backtracked from *Washington*.  The "physical zone of danger test" applied there is
in tension with "traditional and accepted negligence principles," and strict adherence to that rule
in *Washington* "effectively immunized the funeral home for the injury"—*i.e.*, the "serious emo-
tional distress" resulting from the "mishandling of" a "corpse"—that was "most likely to be caused

by its negligence." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 804–05 (D.C. 2011).  One commentator has "concluded that, in D.C., after *Hedgepeth*, plaintiffs *can* now recover for emotional distress resulting from negligent mishandling of human remains" when there is a "legally recognized relationship between the parties" and a duty owed by the defendant.  Christopher Ogolla, *Emotional Distress Recovery for Mishandling of Human Remains: A Fifty State Survey*, 14 Drexel L. Rev. 297, 329 (2022) (emphasis added).  So absent further guidance—which the parties have not provided—there seems to be uncertainty about how D.C. courts would analyze a claim for interference with a dead body and about the contours of such a claim.

This preview of the potentially complicated and unsettled state-law issues is illustrative rather than exhaustive.  And regardless of each question's complexity, "the process of discerning, interpreting, and deciding a half-dozen state-law claims"—for two differently situated defendants, no less—"could be described as undertaking to resolve a 'complex issue of State law.'"  *Araya*, 775 F.3d at 418.  Further, this case does not appear to be one where the Court will need to address these issues for the remaining defendants down the road.  Those defendants—Porter, his company, and Purnell—seem unlikely to raise defenses under the CMPA, which protects the District and, arguably, employees of the District.  And the allegations about the negligent interference with Manyan's corpse focus on the District's actions rather than those of the remaining defendants. *See, e.g.*, Second Am. Compl. ¶ 232 ("the District of Columbia refused the Plaintiffs access to the dead body").  So the "gain to judicial economy by retention of" the state-law claims against the District and Mickens—if any—might not outweigh the reasons for declining supplemental jurisdiction.  *Gino Morena Enters.*, 44 F. Supp. 2d at 53.  Nor does the "the investment of resources" appear "so great as to warrant retaining jurisdiction"; discovery has not begun, and the parties have completed only one round of pleading-stage briefing.  *Mitchell*, 402 F. Supp. 2d at 235 (declining

jurisdiction over state-law claims in part because "discovery in th[e] case has been minimal"). Finally, "litigating this case in the D.C. Superior Court will be just as geographically convenient to the parties as keeping the case here," so the "convenience" factor cuts against keeping the state-law claims as well. *Webster*, 2020 WL 5107547, at *2.

The parties did not meaningfully address supplemental jurisdiction in their briefing, likely because all wanted the Court to retain jurisdiction. But for the above reasons, "the Court has jurisdictional concerns that preclude it from reaching the merits of the" District's and Mickens's motions to dismiss the state-law claims "without further briefing." *McNeil v. Duncan*, No. 19-cv-694 (RDM), 2020 WL 1536252, at *6 (D.D.C. Mar. 31, 2020). So it will deny without prejudice those motions as to Counts III, IV, V, VI, IX, and X, subject to the District's and Mickens's renewed motions that should address the question of supplemental jurisdiction given the Court's reservations.

### C.    The Manyans' Request for Leave To Amend Is Improper and Unavailing

With one sentence at the end of each opposition brief, the Manyans request "leave to amend the Second Amended Complaint, if necessary." ECF No. 44 at 34; ECF No. 45 at 39. That is not a proper motion for leave to amend. Indeed, "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought"—is not "a motion within the contemplation of Rule 15(a)" of the Federal Rules of Civil Procedure. *La. Sch. Emps. Retirement Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010). Not only does this "throwaway language" fall short of constituting a "motion to amend," but the Manyans also failed to "submit a copy of the revised complaint" when "they filed their memorandum in opposition." *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) (no abuse of discretion to deny leave to amend where plaintiffs requested such leave in "[t]he final sentence

of their memorandum in opposition"). Their request therefore violates this Court's local rules. *See* LCvR 7.1(a) (requiring a separate motion with "specific points of law and authority"); LCvR 15.1 (requiring a "copy of the proposed pleading as amended"). And the Court has already granted the Manyans leave to amend once after they amended their complaint as of right within 21 days of service. *See* Minute Orders of February 12, 2024, and March 21, 2024. Thus, the Court will not grant leave to amend based on the one-sentence "aside" in the opposition briefs. *Kuyat*, 747 F.3d at 444.

## IV.    Conclusion

For all the above reasons, the Court will grant the Motions to Dismiss of Defendants District of Columbia and Anthony Mickens as to Counts I, II, VII, and VIII. The Court will deny those motions without prejudice as to Counts III, IV, V, VI, IX, and X, subject to their renewal. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: January 28, 2025