## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RADCLIFFE MANYAN et al.,

       *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA et al.,

       *Defendants*.

Civil Action No. 23-3192 (TJK)

## <u>MEMORANDUM OPINION</u>

Maurica Manyan served as a Public Library Special Police Officer for the District of Columbia. In 2022, the District hired Jesse Porter, Jr. to hold a training session for Manyan and other officers in the Anacostia public library. While the officers and trainers took pictures after the training, Porter shot Manyan, causing her death. Her family sued Porter—who was convicted for involuntary manslaughter—along with his company, his co-trainer, the District of Columbia, and Metropolitan Police Department Officer Anthony Mickens. The latter two moved to dismiss, and the Court granted the motion as to the federal claims against them but ordered renewed motions to address whether supplemental jurisdiction was appropriate over the remaining state-law claims against those defendants.

The Court will dismiss all remaining claims against Mickens and the District but will do so for different reasons. Because Mickens raises a threshold defense implicating a novel and complex state-law question, the Court will decline to exercise supplemental jurisdiction over the claims against him. Thus, it will dismiss those claims without prejudice. The District's invocation of that same defense, however, raises no such unsettled state-law questions for all but one of the claims against it. In brief, the relevant D.C. workers' compensation scheme provides the exclusive

remedy for the injuries underlying the Manyans' claims for negligence, gross negligence, battery, and negligent and intentional infliction of emotional distress. So the Court will grant the renewed motion to dismiss for those claims. But the Manyans' claim against the District for tortious interference with a dead body is not so straightforward. Rather, that claim seems predicated on a different, potentially non-covered injury, and for that reason (and others) this claim raises unsettled questions under state law better left for D.C. courts. As with the claims against Manyan, then, the Court will not exercise supplemental jurisdiction over this claim and will dismiss it without prejudice.

## I.    Background

For detailed background about this case, the Court refers to its earlier memorandum opinion granting the District's and Mickens's motions to dismiss in part and ordering further briefing on supplemental jurisdiction. *See* ECF No. 57; *Manyan v. District of Columbia*, No. 23-cv-3192 (TJK), 2025 WL 315140 (D.D.C. Jan. 28, 2025). An overview of the Manyans' allegations suffices here. In 2022, the District of Columbia contracted with Jesse Porter, Jr.'s company to provide baton training for Manyan and other D.C. Public Library Police Officers. ECF No. 52 ("Second Am. Compl.") ¶¶ 29, 46. Officer Anthony Mickens allegedly coordinated various aspects of Porter's visit for the training. *See id.* ¶¶ 16, 39. When Porter showed up with his co-trainer Byron Purnell, Porter was carrying a loaded firearm "in plain view." *Id.* ¶¶ 40, 48–49. And once the training began, he allegedly treated Manyan differently than he did the other trainees. Porter was dismissive when she asked questions, grew irritated when she read slowly, "point[ed] his finger" at Manyan and "pull[ed] the trigger of a make believe gun," and called her "Rihanna" when she "fix[ed] her hair." *Id.* ¶¶ 61, 71, 78.

While the group posed for pictures after the training, Porter stepped out of the photograph line and shot Manyan in the chest. Second Am. Compl. ¶ 79. She died that same day, and Porter

pleaded guilty to involuntary manslaughter about a year later.  *Id.* ¶¶ 92, 102.  In the second amended complaint, several of Manyan's family members bring ten claims—four under federal law and six under state law—against each of these defendants: the District of Columbia, Mickens, Purnell, Porter, and Porter's company.  The federal batch includes alleged violations of the Fourth and Fifth Amendments, as well as claims under 42 U.S.C. § 1983 for "excessive force resulting from inadequate training" and "failure to train, custom and policy of indifference."  *Id.* at 45, 47; *id.* ¶¶ 114–43, 195–213.  For their part, the state-law claims include battery, negligence, gross negligence, "tortious interference with a dead body," and infliction of emotional distress—both the negligent and intentional varieties.  *Id.* ¶¶ 144–94, 214–36.

Mickens and the District moved to dismiss all claims against them.  *See* ECF Nos. 40–41.  The other defendants did not; the Clerk of Court entered default against Purnell, *see* ECF No. 53, and Porter and his company answered the second amended complaint, *see* ECF Nos. 42–43.  Earlier this year, the Court granted in part and denied in part those motions to dismiss.  *See* ECF No. 57.  The Manyans had failed to state a federal-law claim, so all such claims were dismissed as to Mickens and the District.  *See id.* at 5–18.  But the Court denied the motions without prejudice as to the state-law claims against those defendants.  Because only non-federal claims remained against Mickens and the District, the Court explained that the basis for retaining supplemental jurisdiction over them seemed questionable.  *See id.* at 18–25.  The parties, however, had not meaningfully engaged with supplemental jurisdiction in their briefing.  So the Court, after denying the motions, permitted Mickens and the District to file renewed motions to dismiss that addressed that jurisdictional issue.  *See id.* at 25.

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor."  *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014).  Still, the Court need not accept the truth of "legal conclusions."  *Iqbal*, 556 U.S. at 678.  Put another way, "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.  Analysis

Naturally, the parties disagree about whether—assuming the Court exercises supplemental jurisdiction—the state-law claims survive under Rule 12(b)(6).  But they also disagree on the predicate question of whether the Court should exercise such jurisdiction.  Mickens and the District contend that the Court should retain jurisdiction over the state-law claims to "avoid the waste of parallel litigation and risk of inconsistent decisions."  ECF No. 58 at 13.  The Manyans want the opposite; they say that supplemental jurisdiction is inappropriate and that the Court should "make no rulings on" the "remaining state-law claims."  ECF No. 61 at 7.  For the reasons explained below, the Court will dismiss all those claims—some without prejudice after declining to exercise supplemental jurisdiction over them, and others on the merits after exercising that jurisdiction.[1]

First, some table-setting on this jurisdictional issue.  When a district court has "original jurisdiction" over a case, it also has "supplemental jurisdiction over all other claims that are so

---

[1] The Manyans devote a sizable portion of their opposition to arguing that they adequately pleaded the federal-law claims that the Court already dismissed.  *See* ECF No. 61 at 17–28.  But the Court's previous memorandum opinion did not invite them to do that, and they identify no basis for reconsidering the Court's decision to dismiss those claims.

4

related to claims in the action within such original jurisdiction that they form part of the same"
Article III "case or controversy." 28 U.S.C. § 1367(a). In simpler terms, "a federal court often
has the power to decide state-law questions" if the complaint brings a sufficiently related federal-
law claim. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025). That threshold
question is straightforward here: the state-law claims arise out of the training-day shooting, so they
are related enough to the federal claims for supplemental-jurisdiction purposes. But having the
power to address state-law claims is different from exercising that power. Recognizing as much,
Congress provided that the Court "may decline to exercise supplemental jurisdiction over a" state-
law claim even when it *could* keep the claim under the jurisdictional grant within § 1367(a). *See*
28 U.S.C. § 1367(c). And it set out four contexts in which the Court may decline to do so: (1) the
claim raises a novel or complex state-law issue; (2) the claim substantially predominates over the
federal-law claims; (3) the Court has dismissed all the federal-law claims; and (4) a catch-all "com-
pelling reasons" option for "exceptional circumstances." *Id.* When deciding whether to decline
supplemental jurisdiction within one of these contexts, courts in this District also consider "judicial
economy, convenience, fairness, and comity." *Edmondson & Gallagher v. Alban Towers Tenants
Ass'n*, 48 F.3d 1260, 1266 (D.C. Cir. 1995); *see also, e.g.*, *Delaney v. District of Columbia*, 612
F. Supp. 2d 38, 45 (D.D.C. 2009); *Mattwaoshshe v. United States*, 557 F. Supp. 3d 28, 43 (D.D.C.
2021).

Those considerations lead to mixed results here. But the bottom line is that supplemental
jurisdiction over the state-law claims against Mickens is inappropriate because the threshold de-
fense under the Comprehensive Merit Personnel Act ("CMPA" or "the Act") creates a novel and
complex question for a defendant who has no federal claims against him. The remaining claims
against the District, though, are *mostly* a different story. For all but one, the CMPA applies—in

5

neither a novel nor complex way—and bars suit. Still, the claim against the Distritct for tortious interference with a dead body presents the kind of novel and complex question better suited for D.C. courts, so the Court will treat that claim like the ones against Mickens and dismiss it without prejudice.

### A.    The Court Will Decline Supplemental Jurisdiction over the State-law Claims Against Mickens

Mickens and the District contend that the CMPA "bars *each* common law claim against" them. ECF No. 58 at 13 (emphasis added). This threshold question, however, presents a novel and complex state-law issue that renders supplemental jurisdiction inappropriate as to the state-law claims against Mickens. *See* 28 U.S.C. § 1367(c)(1).

For good reason, federal courts are wary of exercising their discretion in a way that leads them into uncertain questions of state law. That is why a novel or complex state-law issue can be an "*independently sufficient*" basis for declining supplemental jurisdiction. *Edmondson & Gallagher*, 48 F.3d at 1265 (emphasis added). Avoiding "needless federal decisions of state law," after all, promotes two important values: "comity" between state and federal courts as well as "justice between the parties." *Webster v. District of Columbia*, No. 20-cv-300 (JDB), 2020 WL 5107547, at *2 (D.D.C. Aug. 31, 2020) (citation modified) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). Indeed, "the preference" is that "state courts apply state law," particularly when (as here) "public policy considerations" may be relevant to how a state court resolves the issues. *Brown v. Gino Morena Enters.*, 44 F. Supp. 2d 41, 53 (D.D.C. 1999). Another reason for that preference is that the "more novel a local-law issue is, the more likely the federal court is to get it wrong"—not as a matter of first principles, but "in the sense of deciding the issue differently from how a local court would have decided it." *Fotobom Media, Inc. v. Google LLC*, 719 F. Supp. 3d 33, 55 (D.D.C. 2024) (citation omitted). So a federal court confronted with such

state-law issues—just like when another one of § 1367(c)'s enumerated "contexts" applies—"ordinarily should[] kick the [claims] to state court." *Royal Canin*, 604 U.S. at 32.

Recall the situation for Mickens after the Court's previous decision: he faces six state-law claims and no federal ones. In some sense, that math alone tips the scale towards state court; "the process of discerning, interpreting, and deciding a half-dozen state-law claims could be described as undertaking to resolve a 'complex issue of State law.'" *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 418 (D.C. Cir. 2014). But the main problem is the character of those claims—or more precisely, of the defense that Mickens raises against them.

That defense rests on the CMPA, *see* D.C. Code §§ 1–623.01 *et seq.*, which establishes a workers' compensation scheme that typically provides the "exclusive remedy against the District for District employees injured in the course and scope of their employment." *Colbert v. District of Columbia*, 304 A.3d 199, 201 (D.C. 2023). By its terms, the Act's exclusive-remedy provision seems to apply only to "the District of Columbia government or an instrumentality thereof." D.C. Code § 1-623.16(c). But Mickens—an individual police officer—contends that the CMPA shields him too. ECF No. 58 at 32–34. He and the District acknowledge that the "D.C. Court of Appeals has not squarely addressed whether the CMPA bars suits against co-employees." *Id.* at 33. And rightly so: that court recently "note[d]" but did "not resolve" the "open question of whether the exclusivity provision bars public employee suits against their co-employees." *Colbert*, 304 A.3d at 204. On first blush, then, the claims against Mickens present the kind of "novel question of state law" that countenances "declin[ing] to exercise supplemental jurisdiction." *Fotobom Media*, 719 F. Supp. 3d at 55–56.

So too on second blush. Mickens and the District also point out that a different D.C. law, the Workers' Compensation Act ("WCA"), "prohibits suit between co-employees," and they say

the CMPA should be read the same way despite having different statutory language. ECF No. 58 at 33. But their rejoinder does not solve this novelty problem. If the rule for co-employee suits under the WCA so clearly answered whether the CMPA barred such suits, the D.C. Court of Appeals presumably would have just said so two years ago in *Colbert*. Moreover, the difference in statutory language seems to foreclose a straightforward answer. After all, the WCA provides that compensation under the statute is the "exclusive remedy against the employer . . . *and any employee*" for injury or death "arising out of and in the course of [the] employment." D.C. Code § 32-1504(b) (emphasis added). Small wonder, then, that D.C. courts read that provision to mean what it says about precluding suits "against a fellow employee." *McGregor v. Grimes*, 884 A.2d 605, 606 (D.C. 2005). But that straightforward interpretation of the WCA provides little guidance on whether the differently worded CMPA applies to the claims against Mickens. As *Colbert* explains, "differences in statutory language" can be "relevant to [the] construction of the several compensation statutes" under D.C. law, even though they share certain features. 304 A.3d at 205 (citation omitted).

True, Mickens and the District cite a case in which the D.C. Court of Appeals interpreted the CMPA to include a "fundamental principle of workers' compensation law" that the WCA expressly referenced but the CMPA did not. *McCamey v. D.C. Dep't of Emp. Servs.*, 947 A.2d 1191, 1200–01 (D.C. 2008). And perhaps the D.C. courts will interpret the WCA and CMPA to run coextensively as to suits by fellow employees despite the different statutory language. *See Ross v. D.C. Dep't of Emp. Servs.*, 125 A.3d 698, 702 (D.C. 2015). Or those courts might view the CMPA's omission of any reference to co-employee suits in its exclusivity provision as evidence that the statute does *not* extend as far as the WCA does. Either way, how to harmonize these statutes—if at all—is "best" left to the "state court," especially given the important "public policy

8

considerations" surrounding workers' compensation. *Brown*, 44 F. Supp. 2d at 53.

Moreover, as the Court noted in its earlier decision, declining supplemental jurisdiction over the claims against Mickens likely means that the Court need not address this novel question at all because the other defendants seem unlikely to raise it. *See* ECF No. 57 at 24. If so, the comity principle underlying § 1367(c)(1) applies without reservation. Mickens and the District do not suggest that adjudicating the claims against the other defendants will require the Court to answer this unsettled question. Instead, they contend that it is "immaterial" whether those defendants—Porter, his company, and Purnell (and possibly the District)—will raise a CMPA defense to create a novel and complex state-law question. ECF No. 58 at 20. Their response misses the point of the Court's observation that this feature cuts against exercising supplemental jurisdiction over the claims against Mickens. The Court has never suggested that the "state and federal claims" do not "arise from a common nucleus of operative fact." ECF No. 58 at 20. But that inquiry goes to whether the Court has supplemental jurisdiction under § 1367(a)—not whether it should, despite that jurisdictional grant, decline to exercise it under § 1367(c).

Finally, the interests of "judicial economy, convenience, fairness, and comity" do not support retaining supplemental jurisdiction over the state-law claims against Mickens. *Edmondson & Gallagher*, 48 F.3d at 1266. Comity weighs most heavily on the scale here. Simply put, the "interest" in "having state courts decide issues of developing state law" is "crucial." *Vigilant Ins. Co. v. EEMAX, Inc.*, 362 F. Supp. 2d 219, 224 (D.D.C. 2005). As explained, the D.C. Court of Appeals has left open this question about the scope of the CMPA's exclusivity bar. And respect for that court—as well as the D.C. judicial system more broadly—points towards permitting it to answer that question first, especially because that answer "may have serious long-term consequences for" employee liability in the District. *Id.* at 223. The other factors, moreover, do not

"overcome" these comity concerns. *Id.* at 224. Although the parties have briefed motions to dismiss, neither they nor the Court has expended the significant kind of resources in discovery or for trial that might create countervailing fairness or judicial-economy concerns. *See id.* (declining supplemental jurisdiction because of novel state-law questions even though "the summary judgment motion was briefed"); *see also Mattwaoshshe*, 557 F. Supp. 3d at 44 (declining supplemental jurisdiction was not "overly . . . unfair to the parties" given "the early stage of the[] proceedings" and lack of "discovery"). Nor does the "convenience" factor move the needle. Even though Mickens and the District would prefer to receive answers to their defenses here rather than in a different suit, any inconvenience litigating in D.C. Superior Court rather than this Court does not outweigh the comity concerns. *See Vigilant Ins. Co.*, 362 F. Supp. 2d at 224.

Mickens and the District respond mainly by worrying about parallel litigation that might create "inconsistent rulings": claims against Mickens may proceed in D.C. Superior Court, while claims arising from the same factual nucleus proceed against the remaining defendants here. *See* ECF No. 58 at 19–20. But this concern is overstated. All the claims against Mickens, he and the District contend, are subject to a threshold bar under the CMPA. If they succeed on that theory, then there would seem to be no chance for inconsistent decisions. But even if they are wrong about that issue, they have not articulated what conflicting rulings might arise. So it remains unclear how a potential ruling in Superior Court on the state-law claims against Mickens would create tension with rulings on the state-law claims against other defendants here.[2] Given the novelty and

---

[2] The contours of the battery claim against Mickens, for example, are far from clear. That claim seems to focus on "Porter's behavior" as an alleged "agent for the District of Columbia," and Defendants have not explained how those issues would generate clashing decisions in a Superior Court case against Mickens. Second Am. Compl. ¶ 145. And the other claims largely focus on Porter's conduct too, leaving unclear how a Mickens-focused case would create conflicting rulings. *See id.* ¶ 154 (alleging intentional infliction of emotional distress based on "intentional or

complexity of the state-law question implicated by Mickens's threshold defense, the mere possibility that different courts might reach (and perhaps decide) an issue as to different defendants does not outweigh these other considerations.

For all these reasons, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims against Mickens. So it will dismiss those claims without prejudice.

**B.    The Court Will Mostly Retain Jurisdiction over and Then Dismiss the State-law Claims Against the District, but It Will Dismiss One Claim Without Prejudice**

The Manyans mainly contend that unsettled state-law issues involving the claims against the District point towards Superior Court too. But the reasons for declining supplemental jurisdiction over the claims against Mickens do not extend to most claims against the District. To the contrary, the CMPA unquestionably covers claims seeking to impose liability on "the District of Columbia government," D.C. Code § 1-623.16(c), and no exception applies. Thus, the Court will assert jurisdiction over and then dismiss those claims. The tortious-interference claim, however, rests on different footing that points to declining to exercise supplemental jurisdiction over it.

**1.    The CMPA Bars Most State-Law Claims Against the District**

As mentioned, the CMPA "creates a workers' compensation scheme" for the District's employees. *Colbert*, 304 A.3d at 201. An employee qualifies for coverage if she suffers an "[a]ccidental injury or death arising out of and in the course and scope of employment." D.C. Code § 1–623.01(5)(A)(i). An "injury," the Act explains, includes those "caused by the willful act of third

---

reckless" conduct by Porter); *id.* ¶¶ 184–185 (alleging negligent infliction of emotional distress based on Porter's "reckless" conduct in "shooting an unarmed person"); *id.* ¶ 218 (alleging gross negligence based on Porter's "wanton, willful, and/or malicious" conduct). Perhaps there will be some overlapping litigation about whether Mickens and Purnell—who has not shown up in this litigation—"were acting within the scope of their employment" during the training session. *E.g.*, *id.* ¶ 186. But that possibility does not outweigh the other reasons pointing towards declining supplemental jurisdiction.

persons directed against an employee because of his or her employment." *Id.* § 1–623.01(5)(B)(i). The Act also sets out a monthly compensation formula for an employee's family members if "death results from an injury sustained in the performance of duty." *Id.* § 1–623.33(a).

The benefit of guaranteed compensation for covered injuries regardless of fault comes with a trade-off: the loss of the "right to sue the government" for those injuries. *Colbert*, 304 A.3d at 207. Given the Act's statutory remedies, the CMPA provides that the District's "liability . . . with respect to the injury or death of an employee" is "exclusive and instead of all other liability of the District"—whether to "the employee," his "legal representative," or "any other person otherwise entitled to recover damages from the District . . . because of the injury or death." D.C. Code § 1–623.16(c). Although the CMPA exclusivity bar may seem harsh in some cases, its applicability means that the injury is compensable under the Act. And vice versa: the injury is not compensable when the exclusivity bar does not apply, which might "effectively prevent recovery for some victims whose claims or circumstances may not be conducive to a lawsuit." *Nunnally v. D.C. Police & Firefighters' Ret. & Relief Bd.*, 184 A.3d 855, 860 n.10 (D.C. 2018).[3] Finally, if there is a "substantial question" about "whether an employee's injury covered by the CMPA, the employee must submit her claim to the [Department of Employment Services]." *Colbert*, 304 A.3d at 209 n.8 (citation omitted). The employee may sue "only if the claim is disallowed" there. *Id.* So if the employee has not gone to that department first, the Court should "stay" the case if it finds that such a "substantial question" exists—that is, "unless the injury is 'clearly' not compensable under CMPA." *Grillo v. District of Columbia*, 731 A.2d 384, 386 (D.C. 1999) (citation omitted).

---

[3] *Nunnally* addressed the Police and Firefighters Retirement and Disability Act. But as with the WCA, that statute is like the CMPA in some ways, so decisions interpreting each statute can inform questions about the others. *See Colbert*, 304 A.3d at 204–05. At the same time, those similarities do "not mean that differences in statutory language are never relevant to construction of the several compensation statutes." *Id.* at 205 (internal quotation marks and citation omitted).

By its clear terms, the CMPA bars the Manyans' state-law claims against the District for battery, negligence, gross negligence, intentional infliction of emotional distress, and the negligent version of that tort. The CMPA covers any "[a]ccidental injury or death arising out of and in the course and scope of employment." D.C. Code § 1–623.01(5)(A)(i). The Act thus applies—and precludes suit—if two things are true about Manyan's injuries: it arose out of her employment and occurred within the "course and scope" of that employment. Both requirements are met.

Start with the "arising out of" requirement. "All risks causing injury to a claimant"—including, here, Porter shooting Manyan—"can be brought within three categories: risks distinctly associated with the employment, risks personal to the claimant, and 'neutral' risks—i.e., risks having no particular employment or personal character." *Lee v. Dep't of Emp't Servs.*, 275 A.3d 307, 313 (D.C. 2022). An example illustrates the contours of each: if a bus driver is "blindsided by another vehicle while driving her route," that injury flows from "an employment-related risk"; if she is "struck by lightning" while working, that is a "neutral risk"; and if she dies "a natural death" on the job, that is a "personal risk." *Id.* Employment-related risks, by definition, arise out of the scope of employment; neutral risks sometimes do; and personal risks never do. *See id.*

Manyan's injuries did not result from a personal risk. The second amended complaint alleges that she was at the training where Porter shot her *because of* her job. Her employer hired Porter to hold the training session, which Manyan had to attend because it was "mandatory." Second Am. Compl. ¶¶ 3, 16. In other words, the allegations do not suggest that this risk—Porter shooting her—would have followed Manyan outside her job like a personal risk—say, a blood clot—might have. So the injury-causing risk here is not "thoroughly disconnected from the workplace" in a way that renders it personal. *Gaines v. D.C. Dep't of Emp't. Servs.*, 210 A.3d 767, 772 (D.C. 2019) (citation omitted).

That leaves employment-related risks and neutral risks.  Even giving the Manyans the more favorable classification of a neutral risk, the Court finds that Manyan's injuries arose out of her employment and are thus subject to the CMPA's exclusivity provision.  For these risks, D.C. courts ask whether the injury "would not have happened *but for* the fact that conditions and obligations of the employment placed [the] claimant in a position where [s]he was injured."  *Lee*, 275 A.3d at 313 (quoting *Bentt v. D.C. Dep't of Emp't Servs.*, 979 A.2d 1226, 1232 (D.C. 2009)).  This is a "liberal standard" for compensability, meaning that the "employee need not be engaged" in "activity of benefit to the employer" when the injury happens.  *Id.* (internal quotation marks and citation omitted).  As explained, Manyan was in the library to attend a mandatory training and would not have been in Porter's vicinity but for her job obligations.  So her injuries arose out of her employment.

Those injuries also occurred in the course and scope of her employment.  An injury meets this requirement if it happens "during a reasonable and foreseeable activity that is reasonably related to or incidental to the employment."  *Rieger v. D.C. Dep't of Emp't Servs.*, 316 A.3d 459, 468 (D.C. 2024) (citation omitted and modified).  Again, Manyan was "in a location that the [District] would reasonably have expected her to be"—the District library that hosted the training—when she suffered her injuries.  *Id.*  And that training was not just "reasonably related to or incidental to" Manyan's employment—it was a mandatory event for her job that she had to attend.  *Id.*

Because the Manyans seeks to impose "liability" on the District "with respect to" Manyan's covered injuries and death, the CMPA's exclusivity provision kicks in and bars suit.  D.C. Code § 1–623.16(c).

The Manyans disagree for several reasons, but none saves their claims.[4]  They seem to attack the arising-out-of requirement on two grounds: the CMPA does not cover Manyan's injuries resulting from "an assailant specifically target[ing] an employee for personal reasons," and the "tort was committed in a manner that was intertwined with gender discrimination."  ECF No. 61 at 28–31; *see also* ECF No. 44 at 21.  Beyond those challenges, the Manyans contend that the injuries occurred "after [Manyan's] employment ended" and thus were not suffered within the course of her employment.  ECF No. 61 at 30–31; ECF No. 44 at 22.  Finally, they suggest that the CMPA does not apply when an employee "suffer[s] severe physical and emotional distress that render[s] her incapacitated."  ECF No. 61 at 31–32.  None of these arguments places the claims at issue above beyond the CMPA's reach, so they do not stave off dismissal.

Begin with the Manyans' argument that the CMPA does not apply to injuries resulting from an assailant's attack.  ECF No. 61 at 31.  As explained, Manyan's injuries and death arose out of her employment because she would not have suffered them but for her job obligations.  And describing Porter as an "assailant" does not change that result.  After all, the CMPA defines "injury" to include "[a]n injury caused by the willful act of third persons."  D.C. Code § 1–623.01(5)(B)(i).  That kind of injury is still "accidental," *see id.* § 1–623.01(5)(A)(i), from "the perspective of the employer" because the employer did not commit the attack.  *See Grillo v. Nat'l Bank of Wash.*, 540 A.2d 743, 748 (D.C. 1988) (situations where "a co-employee or third party intentionally injures an employee" are covered "so long as the injury arose out of and occurred in the course of employment").  So this argument does not show that Manyan's injuries from the

---

[4] The Manyans' opposition is often hard to follow, and they appear to focus their CMPA arguments on the novelty and complexity of potential state-law questions.  *See* ECF No. 61 at 28. Still, because they pressed similar arguments against dismissal in their previous opposition, the Court will construe this opposition in light of their prior briefing.

shooting are non-compensable.

The Manyans fare no better by contending that injuries from sexual harassment or gender discrimination do not arise out of employment under the CMPA. That is true as a general matter: the D.C. Court of Appeals has "held that mental and emotional injuries resulting from sexual harassment in the workplace could not be classified as 'injuries' arising out of employment." *McCrea v. D.C. Police & Firefighters' Ret. & Relief Bd.*, 199 A.3d 208, 210 (D.C. 2019). Such injuries attributable to sexual harassment are thus not compensable under the CMPA. *See Estate of Underwood v. Nat'l Credit Union Admin.*, 665 A.2d 621, 635–36 (D.C. 1995) (discussing *King v. Kidd*, 640 A.2d 656, 664 (D.C. 1993)). From this baseline, the Manyans contend that given the allegations about sexual harassment and discrimination, Manyan's injuries and death did not "arise out of" her employment.

But the exception they rely on is not so broad. Indeed, "*Underwood* urged caution regarding the scope of sexual harassment claims excluded from workers' compensation." *Nunnally*, 184 A.3d at 861 n.11. That case held only that tort claims "*premised on* alleged disability from sexual harassment" implicate several policy concerns and thus fall outside the coverage of the WCA (which, again, uses the same relevant language as the CMPA). *Id.* at 860–61 (emphasis added); *see also Underwood*, 665 A.2d at 633 n.18 (noting that the case did not present "an emotional distress claim *grounded only in part* on sexual harassment" (emphasis added)). But the principle that a "disabling emotional injur[y]" does not arise out of employment when it is "attributable *entirely* to sexual harassment," *Parkhurst v. D.C. Dep't of Emp't Servs.*, 710 A.2d 854, 856 (D.C. 1998) (emphasis added), does not mean that an injury escapes the CMPA whenever a plaintiff alleges that she endured some gender-based discrimination or sexualized comments *before* the injury.

The Manyans do not seek recovery for an injury to Manyan "resulting from emotional distress attributable to sexual harassment," *Underwood*, 665 A.2d at 634, so this exception—whatever its scope—does not render the CMPA inapplicable. No doubt, they allege that Porter "was hostile toward Manyan" and "treated" her differently than he did male officers. Second Am. Compl. ¶ 60. He also purportedly made several inappropriate comments, including calling Manyan "Rihanna" and saying that she "look[s] like she sleeps on her stomach." *Id.* ¶¶ 63, 78. But other than a conclusory allegation that this "discriminatory" treatment "led to her death," *id.* ¶ 65, the Manyans plead no facts supporting the inference that the injury from the shooting *resulted from* sexual harassment. Instead, Manyan died because her trainer shot her while they took pictures after a mandatory training. In this way, the injuries "are directly traceable" to "part of h[er] employment"—mandatory training—and does not "arise[] out of something that is not a risk incidental to employment," even if Porter had some "discriminatory animus" when conducting the training. *Hamilton v. Sanofi-Aventis U.S., Inc.*, 628 F. Supp. 2d 59, 64 n.3 (D.D.C. 2009) (rejecting argument that *Underwood* exception applied).

More to the point, the injuries for which the Manyans seek recovery are not sexual-harassment or gender-based injuries. As *Underwood* explains, "sexual harassment robs the person of dignity and self esteem." 665 A.2d at 635 (quoting *Byrd v. Richardson-Greenshields Sec., Inc.*, 552 So.2d 1099, 1102–04 (Fla. 1989)). Because those "injuries are separable," they "should, and can be, enforced separately" from "work place injuries." *Id.* (citation omitted). But most of the Manyans' common-law claims request damages for the physical injuries Manyan suffered and for her death that resulted from the shooting. The battery count, for example, hinges on the alleged "intentional offensive and non-consensual touching" of Manyan—that is, the shooting. Second Am. Compl. ¶ 147. So too for the claims for intentional and negligent infliction of emotional

distress, which focus on the "emotional distress" that Manyan and her family suffered after "re-aliz[ing] that she was shot in the chest"—not after realizing that Porter made sexual or gender-based comments. *Id.* ¶¶ 154–55, 184; *see also id.* ¶ 185 ("Defendants' conduct was negligent in shooting an unarmed person . . . ."). The negligence claim follows suit by asserting that "Manyan was shot in the chest" because Defendants negligently permitted live firearms in the training session. *Id.* ¶ 177. And the same holds true for the gross-negligence claim, *id.* ¶ 217, which adds that "Defendants' conduct was wanton, willful, and/or malicious *in shooting* an unarmed person," *id.* ¶ 219 (emphasis added). The upshot is that these claims are not "premised on alleged disability from sexual harassment"; they rest on the injuries from Porter's shooting of Manyan. *Underwood*, 665 A.2d at 637. That Porter allegedly treated Manyan differently because of her gender and made sexualized comments does not transform the shooting-based injuries into sexual-harassment injuries subject to the *Underwood* exception.

Nor do the Manyans escape the exclusivity bar by arguing that because Manyan suffered the injuries "after her employment ended," they did not occur in the course and scope of her employment. ECF No. 61 at 30–31; ECF No. 44 at 22. As explained, an injury occurs in the course of employment if it happens "during a reasonable and foreseeable activity that is reasonably related to or incidental to the employment." *Rieger*, 316 A.3d at 468 (citation omitted and modified). Although the training session had formally concluded minutes before her injury, it was "reasonable and foreseeable" that the trainees and trainers might stay at that location for a few minutes after the training session had concluded. *Id.*; *see also Gaines*, 210 A.3d at 774 (rejecting argument that an employer "should not be responsible for [an employee's] injury" just because the employee "arrived to work . . . nearly two hours early," and collecting cases in which workers' compensation statutes covered injuries occurring before or after the end of the official shift). That is all that is

required.

Resisting this conclusion, the Manyans lean heavily on *Grayson v. District of Columbia Department of Employment Services*, 516 A.2d 909 (D.C. 1986). But *Grayson* is far afield from the allegations here. There, a city bus operator was not entitled to workers' compensation for injuries that she suffered while driving her personal car to lunch after completing her morning shift. *Id.* at 910. So it could not "be said that the conditions of [her] employment as a busdriver exposed her to the dangers attendant the personal use of her automobile during her lunch break." *Id.* at 912–13 (citation omitted). As explained, though, Manyan was injured in a public library for a "work-related reason": the mandatory training that her employer, the District, set up by contracting with Porter. *Rieger*, 316 A.3d at 469; *see also* Second Am. Compl. ¶¶ 39, 41.

*Rieger* confirms that the "in the course of employment" concept is not as narrow as the Manyans suggest. There, a university employee was walking from the hospital building to a different building on campus. *Rieger*, 316 A.3d at 462. While turning onto non-university property, a jogger collided with the employee and caused several injuries. *See id.* Those injuries occurred in the course of employment, the court explained, because Rieger suffered them while in a location reasonably foreseeable to her employer and for a work-related reason. *See id.* at 468. And if Rieger's injuries—resulting from a collision with a jogger while off employer property—happened in the course of employment, then Manyan's—incurred immediately after a mandatory training while in a District library—did too.

Finally, the Manyans say the CMPA is inapplicable because Manyan "suffered severe physical and emotional distress that rendered her incapacitated." ECF No. 61 at 32. But that would seem to be precisely the kind of injury that workers' compensation schemes are meant to cover, which is why the CMPA contemplates that the District will provide "compensation" for

"disability or death." D.C. Code § 1–623.01(12). And the provision for "[c]ompensation in case of death" would mean little if injuries and deaths are not compensable whenever an employee is rendered incapacitated in the moments before her death. *Id.* § 1–623.33. The Manyans gain little traction by citing *Underwood* for the proposition that "claims of intentional infliction of emotional distress . . . resulting in disabling conditions fall outside the purview of the WCA [sic]." ECF No. 61 at 31. Assuming they mean the CMPA, this argument still falters because *Underwood* held only that "emotional distress allegedly *attributable to sexual harassment*" is not a covered injury. 665 A.2d at 633 (emphasis added). And as explained, the injury here is not so attributable.

In short, none of the Manyans' arguments—individually or collectively—shows that the Manyan's shooting-related injuries and death are outside the CMPA's scope. Because the Act applies, the Manyans cannot bring claims here that seek to impose liability on the District "with respect to the injury or death." D.C. Code § 1–623.16(c). And this prohibition covers almost all the state-law claims against the District: battery, intentional and negligent infliction of emotional distress, negligence, and gross negligence. Each seeks damages "with respect to" Manyan's injuries and death resulting from the shooting, and the Manyans offer no basis for distinguishing between these claims for CMPA purposes. *Id.*

Because the CMPA is the Manyans' exclusive remedy for the injuries underlying these claims, the Court will exercise supplemental jurisdiction over them and grant the motion to dismiss as to them.

### 2.     The Court Will Decline to Exercise Supplemental Jurisdiction over the Claim for Tortious Interference

Unlike the claims described above, the Manyans' claim for tortious interference with a dead body does not fall neatly within the CMPA's exclusivity provision. The Manyans allege that the District "refused" to give them "access to the dead body of Maurica Manyan, even though"

they had "requested" such access.  Second Am. Compl. ¶ 232.  And that refusal allegedly caused the Manyans "to suffer severe emotional distress upon the realization that they had no access to [the] body."  *Id.* ¶ 233.  By seeking damages for *that* injury, the Manyans are not necessarily trying to impose liability "with respect to" an "injury or death" covered by the CMPA.  D.C. Code § 1–623.16(c).  The injury underlying this claim is, at the very least, arguably not one "arising out of" and incurred "in the course and scope of" Manyan's employment.  *Id.* § 1–623.01(5)(A)(i).  Instead, the injury relevant to this claim seems to stem from what the District allegedly did *after* the workplace shooting that killed Manyan.  Nor has the District explained how this injury—resulting from lack of access to a family member's body—would be compensable under the CMPA.

The lack of clarity about how the CMPA's exclusivity provision applies to this claim counsels against exercising supplemental jurisdiction.  No other claims—federal or state—remain against the District.  The parties have not identified controlling authority on whether the CMPA's exclusivity provision applies to the kind of injury underlying this claim.  So like the state-law claims against Mickens, "the preference for having state courts apply state law" applies to this seemingly unsettled issue.  *Brown*, 44 F. Supp. 2d at 53.

The unclear boundaries of this specific tort—which the Court would need to address if it falls beyond the CMPA's reach—add another layer of novelty and complexity, confirming that the Court should decline supplemental jurisdiction.  District of Columbia law seems to "recognize[] a legal right in the surviving spouse of a dead person to possess, preserve, and bury the decedent's body."  *Washington v. John T. Rhines Co.*, 646 A.2d 345, 347 (D.C. 1994).  That right traces to *Steagall v. Doctors Hospital*, which held that the "surviving spouse" or "next of kin" possesses such a right.  171 F.2d 352, 353 (D.C. Cir. 1948).  But as the District seemed to acknowledge in earlier briefing, the contours of that right are unsettled.  ECF No. 40 at 36–37 (noting that the

"District of Columbia Court of Appeals has still not identified what 'right of action' a party has" for alleged interference with access to a dead body under *Steagall* "beyond a possessory right"). Indeed, the D.C. Court of Appeals has explained that "[a]nything" in *Steagall* "pertaining to the scope or definition of the tort involved" there "must necessarily be dicta." *District of Columbia v. Smith*, 436 A.2d 1294, 1298 (D.C. 1981).

The Manyans' claim hints at the uncertainty surrounding this tort and, in doing so, implicates novel and complex state-law questions. Mickens and the District contend that the Manyans fail to allege whether "the District had custody of Manyan's body." ECF No. 58 at 47. That strikes the Court as a cramped reading of the second amended complaint, which says that the District "refused" the Manyans "access to the dead body"—something presumably possible only if the District controlled the body. Second Am. Compl. ¶ 232. To be sure, the *scope* of that possessory right may not cover the Manyans' allegations; the District might not have violated this right, for example, if the Manyans "were *eventually* able to possess and bury" the body. ECF No. 58 at 14 (emphasis added). But *Steagall* and D.C. law more generally appear light on details about how broadly the possessory right extends—that is, whether it covers *temporary* deprivations of the right to possess. *See Washington*, 646 A.2d at 350–51 ("[T]he exact nature of th[e] 'right of action' is not revealed by *Steagall*."). Nor do Mickens and the District identify any caselaw settling the scope of that right. *Cf. id.* at 351 (noting that *Steagall* does not suggest that the "right of action, whatever it may be, extends beyond vindication of the right to possess[] and eventually bury"). Thus, this seemingly novel issue is better suited for the D.C. courts in the first instance.

And there is still more uncertainty. Recall that the Manyans allege that the District's "negligent"—or "intentional" or "grossly negligent"—conduct caused them to endure "severe emotional distress" when they learned that they lacked "access to Manyan's body." Second Am.

Compl. ¶ 233.  In other words, they seem to press (at least) the theory that they may "recover damages for emotional distress" when the possessory "right recognized in *Steagall* is negligently violated." *Washington*, 646 A.2d at 347.  No doubt, the D.C. Court of Appeals rejected that theory over thirty years ago for plaintiffs found to be outside the "zone of physical danger" when the distressing incident occurred.  *Id.* (citation omitted).  But that court recognized that others "have limited recovery to situations in which the defendant acted recklessly, willfully, or intentionally in its mistreatment of the decedent's body," *id.* at 349, which may suggest an openness to claims like the Manyans' that allege "intentional" or "grossly negligent" conduct, Second Am. Compl. ¶ 233. In any event, the D.C. Court of Appeals has since explained that the "zone of physical danger test" applied in *Washington* chafes against "traditional and accepted negligence principles." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 804–05 (D.C. 2011) (citation omitted).  And strict adherence to that rule in *Washington*, that court noted, problematically "immunized the funeral home for the injury"—*i.e.*, one resulting from the "mishandling of" a "corpse"—that was "most likely to be caused by its negligence." *Hedgepeth*, 22 A.3d at 805.  True, as Mickens and the District emphasize, *Washington* involved a different kind of alleged corpse-related negligence.  *See* ECF No. 58 at 48.  But the salient point is that D.C. law seems unsettled as to the scope, if any, of an emotional-distress claim tethered to a defendant's allegedly negligent conduct related to a dead body.

Given the preference for state courts to adjudicate those kinds of issues—especially against a defendant facing *no* federal claims—the Court finds that all this uncertainty tilts towards declining supplemental jurisdiction over this state-law claim.  And for the reasons discussed when addressing the claims against Mickens, the factors of judicial economy, fairness, convenience, and comity point the same way.  Although Mickens and the District press the same concern about

inconsistent rulings, the Court has declined supplemental jurisdiction as to the District over only the tortious-interference claim. Because that claim is about how "the District of Columbia" allegedly "refused the Plaintiffs access to the dead body of Maurica Manyan," Second Am. Compl. ¶ 232, it seems to have little to do with the remaining defendants here. Thus, the Court will not exercise supplemental jurisdiction over the Manyans' claim against the District for tortious interference with a dead body and will instead dismiss it without prejudice.

## IV.    Conclusion

For all the above reasons, the Court will decline to exercise supplemental jurisdiction over—and thus will dismiss without prejudice—the remaining claims against Mickens (Counts III, IV, V, VI, IX, and X). The Court will do the same for the claim against the District of Columbia for tortious interference with a dead body (Count X). But as for the other claims against the District—Counts III, IV, V, VI, and IX—the Court will exercise supplemental jurisdiction and dismiss them. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 26, 2025